Mackintosh BROWN and Sylvia L. Brown, Plaintiffs-Appellees,

v.

Don J. McDAVID (and his successor, Devil's Thumb Ranch and Cross Country Center, Inc., a Colorado corporation), Defendant-Appellant,

and

Mountain Valley Investment Corporation, a Colorado corporation, Defendant-Appellee,

and

B.J.R. Associates, a joint venture, Louis C. Yager, J. Donald Yager, George Yager, Louis C. Yager Company, Thomas Hilb, Susan Hilb, Colskilo, Inc., a Mississippi corporation, Harold F. Greenwood, Betty J. Greenwood and Jack H. Bennett, Defendants.

No. 80CA0620.

Colorado Court of Appeals, Div. II.

Nov. 10, 1983.

Thomas C. Seawell, Denver, for plaintiffs-appellees.

George Davies, P.C., William R. Lahey, Denver, for defendant-appellee.

C. Gerald Starbuck, Denver, for defendant-appellant.

SMITH, Judge.

This case arises from the attempt, by the owners of a ranch in Grand County, to develop and subdivide their property.

Although several tracts were sold pursuant to a subdivision development plan, the original owners and their successors ultimately determined to abandon the entire plan. Plaintiffs Mackintosh and Sylvia Brown whose predecessors in title had purchased one of the tracts during the development stage, brought this action seeking to compel the developers and the owners of the ranch to provide them with certain easements, and to enforce certain covenants which were to be part of the development plan and upon which the tract purchasers alleged they relied at the time of the purchase of their respective tracts.

Ultimately, the owners of the other four tracts were made parties to this action, and at trial were aligned as plaintiffs. The case was tried to the court without a jury, and at the conclusion thereof, the trial court entered findings of fact and conclusions of law, and issued its decree determining, in essence, that the covenants, easements, and undertakings to provide easements, which had come into being during the developmental stage, ran with the land, were perpetual, and were not terminable. Having so decreed, the court entered certain orders designed to assure that the affirmative duties, which it found had arisen under the covenants, would be complied with. Upon appeal, we reverse and remand with directions.

Lewis, George, and J. Donald Yager were the joint owners of land in Grand County, commonly known as Devil's Thumb Ranch. In September of 1973, the Yagers entered into a contract with Charles Badsley, C.B. Jensen, and Jack

Randall, who, as joint venturers, acting under the name "B.J.R. Associates" (BJR), agreed to develop and sell Devil's Thumb Ranch.

Under this contract, BJR was permitted to take possession of the ranch, have it surveyed, and to divide it into 26 separate parcels for resale as a ranch subdivision. Ultimately, a plan for development evolved which contemplated that certain protective and restrictive covenants were to be drafted and recorded as sales inducements in connection with the offering of Devil's Thumb Ranch. Pursuant to this plan, five lots were sold to various parties in November 1974. The purchasers were Bennett (Brown's predecessor in title), Mountain Valley Investment Corporation, the Greenwoods, Colskilo Inc., and the Hilbs.

Since the entire ranch was still under contract between the Yagers and B.J.R., it was necessary that the Yagers convey the five parcels to B.J.R., who in turn delivered deeds to the five respective purchasers. The promotional material used by B.J.R. included copies of the proposed restrictive covenants covering "Devil's Thumb Ranch Estates," and which we will refer to as the "Covenant Document."

The purchase contracts between B.J.R. and the above five parties had copies of the Covenant Document attached. At the time of closing of the five sales transactions, the Covenant Document had not been recorded nor was it attached, nor made a part of the deeds transferring title to the respective purchasers. By stipulation, however, the parties agreed that all of the purchasers (including McDavid) had relied on the Covenant Document at the time they purchased their respective lots.

The Hilbs, however, requested that their lot be exempted from the benefits and burdens of the Covenant Document in exchange for an express 60 foot easement, which was, in fact, granted to them across the southern end of the ranch.

B.J.R. recorded the Covenant Document in September 1975, with the county clerk and recorder. Subsequent to that recording, Bennett, Mountain Valley, the Greenwoods and Colskilo each executed a letter ratifying, adopting and confirming the recorded Covenant Document.

Eight months later, in May 1976, the Browns purchased their tract from Bennett. Later in 1976, the Browns and Mountain Valley made a request of B.J.R. and the Yagers for an express, legally described, written grant of easement. These demands were not met, and the Browns subsequently commenced this action and recorded a lis pendens in Grand County.

Following the commencement of this action and the filing of a lis pendens by the Browns, the Yagers, together with B.J.R. sold the balance of the tracts to McDavid. As a result of this transaction, McDavid became the title owner of 21 of the 26 tracts or lots which comprised "Devil's Thumb Ranch Estates."

On May 9, 1977, McDavid recorded with the county clerk and recorder a document entitled "Declaration and Consent to Elimination of Protective Covenants," which document we will refer to as the "Termination Document," and which was recorded for the purpose of terminating the Covenant Document. After McDavid had acquired title and recorded the termination document, he was made a party to this action. He thereafter conveyed his interest in "Devil's Thumb Ranch Estates" to a corporation, Devil's Thumb Ranch and Cross-Country Center, Inc.

## I.

### The Covenant Document

The dispute here revolves around the language of the covenant document, and whether it could be, and was, properly terminated. This document, after describing generally its purposes, as being in furtherance of a plan for development, improvement, and sale of tracts within Devil's Thumb Ranch Estates, declares, *inter alia:*

"These Covenants shall run with said property, and shall be binding upon and inure to the benefit of the Developer, each subsequent owner of said real prop-

erty, or any part thereof, and each successor in interest of each such subsequent owner."

The document then discusses certain easements to be reserved to all of the owners for horseback riding, hiking, cross-country skiing, fishing, and other similar uses, and further purports to require each owner to grant a 60 foot wide easement for access and utility purposes to the owners of all other parcels. These easements were undescribed and unlocated at the time of the execution and recording of the Covenant Document.

The last two paragraphs of the document then read as follows:

"ALL OF THE FOREGOING covenants, conditions, reservations and restrictions shall continue and remain in full force and effect at all times as against the owner of any parcel in Devil's Thumb Ranch Estates, regardless of how he acquired title, until the commencement of the calendar year 2000 A.D., on which date these covenants, conditions, reservations and restrictions shall terminate and end, and thereinafter be of no further legal or equitable effect on such premises, or any owner thereof. NOTWITHSTANDING THE FOREGOING, the Covenants agreements, conditions, reservations, restrictions and charges created and established herein for the benefit of the foregoing owners, and each parcel therein, may be waived, terminated or modified as to the whole of Devil's Thumb Ranch Estates only, with the written consent of the owners of sixty-six per cent (66%) of the parcels in Devil's Thumb Ranch Estates. No such waiver, termination or modification shall be effective until the proper instrument in writing shall be executed and recorded in the office of the Clerk and Recorder in the County of Grand and State of Colorado."

The trial court, in construing this document, concluded, *inter alia,* as follows:

"[T]he recorded Covenants purport to provide for a grant of perpetual easements binding on the grantors, their successors and assigns, and then to provide that the easements are not perpetual and that they do not run with the land but have a fixed expiration date and are terminable at any time. These conflicting terms are irreconcilable and must therefore be construed against the drafters, particularly where, as here, the covenants affect substantial property interests of all the parties. The Court therefore concludes that those provisions of the covenants reserving or providing for a grant of easements should be preserved and specifically enforced in accord with the parties' clear intent."

■ Inasmuch as the trial court's determination proceeds solely from its interpretation of the written document, we are not bound thereby. *Buckley Brothers Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081 (Colo.1981). We do not agree with the trial court's interpretation.

■ Despite the preliminary language in the covenant document providing that the covenants "run with the land," we conclude that there is no material ambiguity within the document. Reading it as a whole, it is apparent that the developers and owners of tracts who subsequently agreed to the document, intended that the covenants, easements, and other agreements, should terminate by the document's own terms, on the commencement of the calendar year 2000 A.D., unless they should be sooner terminated by the execution and recording of an appropriate document so reciting, consented to by the owners of 66% of the parcels in Devil's Thumb Ranch Estates. We construe the reference to covenants running with the land to express the intention that these covenants and agreements should be binding upon all owners of the land, their successors, and assigns, until the same be terminated, either by the terms of the agreement or by the filing and recording of a proper termination agreement.

■ Thus, reading the termination document as a whole, we conclude that it is not ambiguous, nor do we find in its terms any

irreconcilable conflicts. We conclude that the trial court's interpretation is erroneous.

## II.

### Termination

Implicit in the trial court's lengthy ruling, however, is its conclusion that it would be inequitable to allow McDavid to terminate the covenants and thereby abandon the development plan upon which the other purchasers had relied in buying their lots. The parties argue here, in support of the trial court's ruling, that particularly the easements for utilities and access are essential to their use of the land. They assert that they should be, as the trial court determined, perpetual and not subject to termination. We disagree.

■ We do not disagree with the assertion that such easements may be a necessity, but rather with the argument that such necessity precludes exercise of the termination clause. No Colorado cases have been cited to us, nor have we found any dealing with the effect of similar termination clauses. However, the general law is well established that a covenant running with the land in a subdivision may be modified or terminated, when the covenant permits termination, upon the consent of a specified percentage of lot owners.

Such a case, closely analogous to the instant one, is *Matthews v. Kernewood, Inc.,* 184 Md. 297, 40 A.2d 522 (1945). In *Matthews,* a development corporation subdivided parcels of land into thirty-four separate lots and imposed stringent protective covenants. Seventeen years later, only half of the lots had been sold. The developer then exercised his right which had been reserved in the covenants, to annul or change or modify the restrictions, and re-subdivided the unsold lots into smaller parcels with reduced restrictions. Seven owners of the original lots filed suit, charging that they had purchased their lots in reliance on the development plan and original restrictions. The Maryland court observed that the rights of the parties who purchased the original lots must be determined by the agreement they voluntarily made, and that they could not be judicially relieved of a bad bargain into which they themselves had entered. Where covenants terminate on the consent of a specified percentage of lot owners, consent of the proper percentage will terminate the covenants. *See Morgan v. Sigal,* 114 Conn. 39, 157 A. 412 (1931).

■ Since developers and potential lot purchasers are free to contract for the price, terms, and conditions of any sale, when such parties elect to provide for covenants which, by their nature, may be terminated upon certain conditions, then a court must presume that such a contingency is reflected in the consideration paid, and will not rewrite the covenants years later for one of the parties. *Valdes v. Moore,* 476 S.W.2d 936 (Tex.Civ.App.1972); *see Farmers Pawnee Canal Co. v. Pawnee Water Storage Co.,* 47 Colo. 239, 107 P. 286 (1910). Where, as here, the covenant document containing the termination clauses in question, was admittedly relied upon and accepted by all parties, all parties knew the covenants could be terminated and this knowledge became part of the basis of their bargain. *See Sedalia Land Co. v. Robinson Brick & Trial Co.,* 28 Colo.App. 550, 475 P.2d 351 (1970).

■ We have examined the "Termination Document" and conclude that it is sufficient to comply with the provisions of the "Covenant Document" relative to termination. Thus, we hold that all of the covenants, easements, and servitudes created by the Covenant Document were terminated on the date that the Termination Document was recorded. Accordingly, we conclude that each tract owner has no rights or benefits in the land at Devil's Thumb Ranch Estates except those expressly granted by their deeds and as otherwise found in the law. It necessarily follows that the same rule applies as to burdens upon each of the parcels.

## III.

### Issues Remaining

Our determination that the Covenant Document and all of the rights and obliga-

tions which it created has been properly terminated does not, however, resolve all of the issues existing between the parties.

There remain to be determined factual questions relative to location and extent of the access for ingress and egress and for utilities to certain of the parcels which appear to be landlocked. Easements may arise in any number of ways. They may arise by express grant or reservation, covenant, prescription, or implication. Colorado expressly recognizes *implied* easements which may arise by reason of grant and reservation, *see Wagner v. Fairlamb*, 151 Colo. 481, 379 P.2d 165 (1963), *cert. denied*, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 110 (1963), or by necessity, *see Crystal Park Co. v. Morton*, 27 Colo.App. 74, 146 P. 566 (1915), or even by preexisting use. *See Martino v. Fleenor*, 148 Colo. 136, 365 P.2d 247 (1961).

Here, Mountain Valley Investment Corporation appears to have an express easement created by grant apart from the terminated covenants. In its deed there appears the following language:

> "Purchasers are hereby granted an easement for access to this tract of land across the presently existing ranch road, a diagram of said road is attached hereto . . . ."

Defendants Thomas and Susan Hilb likewise appear to have an express easement created by grant. As these grants are wholly separate from the easements granted in the covenant document, they are therefore unaffected by the termination document filed by McDavid. Plaintiffs, Mackintosh and Sylvia Brown, however, do not have a specific grant of easement. They may well, however, have an implied easement under one of the theories previously mentioned.

Because the evidence contained in the record before us discloses facts which may well entitle Browns to an implied easement we remand this case to the trial court for location and determination of the extent of such easements as may have arisen outside of the covenants, specifically as to Mountain Valley and the Browns, as well as to consider if such easements should be decreed as to the other parcels.

The intent of the parties, as disclosed by the evidence, at the time the respective parcels were severed from the original tract, may provide guidance for the trial court in determining the location as well as the reasonable extent and dimensions of such easements. *Wright v. Horse Creek Ranches*, 659 P.2d 705 (Colo.App.1982). *See Westland Nursing Home, Inc. v. Benson*, 33 Colo.App. 245, 517 P.2d 862 (1974). *See also Board of County Commissioners v. Ogburn*, 38 Colo.App. 212, 554 P.2d 700 (1976) (relative to the authority of trial courts to delineate easements).

We conclude that appellants' other contentions are without merit.

The judgment is reversed and the cause is remanded with directions to enter such orders and decrees as shall bring the rights of the parties into accord with the holdings of this opinion.

PIERCE and TURSI, JJ., concur.